**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HENRY PETERS AND PAMELA PETERS,<br>*Plaintiffs*,<br>v.<br>ROLAND DAVID, et al.,<br>*Defendants*. | Civ. Action No. 07-2210 (KSH)<br><br>**Opinion** |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

Jury selection in this matter has been set down for October 1, 2013, with trial continuing day to day thereafter. This opinion is filed after the Court's thorough review of the record and the docket to date.

In May 2007, plaintiffs Henry[1] and Pamela Peters (together, "plaintiffs") filed suit against several individual and corporate defendants. Plaintiffs contended, in effect, that the defendants had violated state and federal law by misrepresenting the true nature and terms of a sale-leaseback scheme supposedly designed to save plaintiffs' home from foreclosure. Because their complaint [D.E. 1] contained claims sounding under the Truth in Lending Act ("TILA," 15 U.S.C § 1601 *et seq.*) and the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*), plaintiffs invoked this Court's federal-question jurisdiction under 28 U.S.C. § 1331. The remaining claims—state-law allegations involving the New Jersey Consumer Protection Act (N.J. Stat. Ann. § 56:8-1 *et seq.*)—fell under this Court's 28 U.S.C. § 1367 supplemental jurisdiction.

[1] Henry Peters has since passed away. [D.E. 114.]

Defendant Alexander Dy denied the allegations and brought state common-law counterclaims against plaintiffs. Dy alleged that he, not plaintiffs, had been defrauded by the transaction, and that plaintiffs and defendant Roland David hid from Dy plaintiffs' history of financial instability and credit unworthiness. Among other contentions in his eventual motion for summary judgment, Dy maintained that he was not a "creditor" as defined by TILA. The Court denied Dy's motion for summary judgment on other grounds in 2010 [D.E. 121].

It is now 2013, more than six years after the complaint was first filed. The intervening years have seen the functional removal of all defendants except for Dy[2] and the gradual winnowing down of claims. It has not, however, been an altogether steady process. For one, the Court expended great effort in encouraging the remaining parties to settle their differences, to no avail. (*See, e.g.*, Order Appointing Special Master [D.E. 148].) But more strikingly, the Court has encountered numerous obstacles in directing the parties to prepare materials and crystalize their allegations for trial.

The Court will recount a small part of the relevant recent chronology. The parties were ordered to submit *joint* proposed jury voir dire and instruction materials, as well as a proposed verdict sheet, by August 7, 2012. The Court emphasized that it would "only entertain these documents as joint submissions," with disputes "clearly delineated within the joint document." [D.E. 150.] The eventual submissions, however, were deficient in numerous respects; and, as the Court learned a few days later, they were not "joint submissions" at all, but rather were prepared solely by plaintiffs' attorney.[3] [D.E. 152.] Striking the filings from the docket, the Court found that the parties' attorneys had "flouted the clear and specific directions of the Court" regarding

[2] For example, the Court entered a default judgment against defendant Roland David in 2012 [D.E. 147].

[3] This was not the first time a party was accused of misrepresenting a unilateral filing as a joint submission. [*See, e.g.*, D.E. 69.]

trial materials. [D.E. 153.] The attorneys were ordered to "appear in Courtroom #5, 3rd floor of the Frank R. Lautenberg U.S. Post Office and Courthouse, Newark, NJ at 9:30am on September 10, 2012, and each consecutive day thereafter, until they have completed a proper joint submission that is acceptable." [D.E. 153.] The revised proposed jury instructions submission that was eventually received by the Court was a document of *80 pages* copied in part from various model instructions without significant tailoring, and containing within numerous objections by one or the other of the parties. [D.E. 160.] The jury-verdict sheet, meanwhile, requested that the jurors assess damages against parties who had long since been dismissed from the suit. [D.E. 163.] In short, the submissions were and are unsatisfactory.

Adding to the Court's difficulty in identifying and defining triable claims, the parties did little to connect their disparate factual allegations to the causes of action alleged in their complaints and answers. This led to this Court's decision *sua sponte* to dismiss certain additional claims in June of this year, after completing a lengthy criminal trial and having available trial time to assign to pending civil cases. [D.E. 169.] In the meantime, the attorneys for the parties wrangled further about ancillary matters, including whether Dy's attorney should be sanctioned for not indicating that a motion to reopen was pending in a bankruptcy proceeding. [*See, e.g.*, D.E. 166.]

In mid-August, 2013, the Court received a letter from Dy's attorney requesting further adjournment until March 2014, due to impending maternity leave. The Court denied the request. Until prompted, counsel for Dy did not reveal whether she had obtained substitute counsel. [D.E. 173.]

Reviewing counsels' trial submissions and finding them functionally unusable, the Court reappraised all submissions on the record, and recognized that it was summoning members of the

public to hear a case that is in federal court on the highly debatable theory that the federal Truth in Lending Act applies to Pamela Peters's claims against Alexander Dy. In these times of scarce resources, it is appropriate for the Court to revisit now its examination of the viability of the federal claim, recognizing that 1) TILA requires that plaintiffs establish that Dy is a "creditor" for purposes of the statute; 2) Dy has all along denied he is a "creditor" under TILA; and 3) that in preserving the claim after Dy sought to resolve it on summary judgment, the Court never specifically and directly ruled on the "creditor" issue.

**II**. **Standard of Review**

A court may reconsider its prior decisions (accounting for the law-of-the-case doctrine) so long as it explains the reasoning behind its decision and takes the appropriate steps to ensure that the parties are not prejudiced by reliance on its prior ruling. *See Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997); *see also DeFranco v. Wolfe*, 387 F. App'x 147, 155–56 (3d Cir. 2010) (nonprecedential) (applying *Runyon* to a *sua sponte* reconsideration of a summary judgment motion); *Sprague v. Fitzpatrick*, 546 F.2d 560, 563 (3d Cir. 1976); *Long Branch Citizens against Hous. Discrimination, Inc. v. City of Long Branch*, No. 09-4980, 2010 U.S. Dist. LEXIS 84243, at *12 (D.N.J. Aug. 17, 2010) (Pisano, J.). Furthermore, entertaining successive summary judgment motions and decisions falls within a trial court's discretion. *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911–12 (9th Cir. 2010) (collecting cases).

Dy has consistently argued that he was not a "creditor" of the plaintiffs, as defined by TILA, at any time in their dealings. [*See*, *e.g.*, D.E. 96 at 4–5.] Whether or not he is a "creditor" is significant, because (as discussed further below) certain relevant obligations of TILA apply to the creditor's conduct in a transaction. When the Court preserved the TILA claim in its summary judgment opinion, the basis was not on a finding that Dy was a creditor, although the

parties were aware of the issue and discussed it summarily in their submissions. *Cf. Brown v. City of Syracuse*, 673 F.3d 141, 147 n.2 (2d Cir. 2012) (suggesting that successive summary judgment motions may be improper if an argument *not* raised in the first is invoked in the second).

In deciding whether summary judgment should be granted, a court must determine whether "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," when the record is viewed and all inferences are drawn in a light most favorable to the non-moving party. Fed. R. Civ. P. 56(a); *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002). "If a non-moving party fails to make a showing sufficient to *establish the existence of an element essential to that party's case* on which it bears the burden of proof at trial, there is no . . . genuine issue of . . . material fact and thus the moving party is entitled to judgment as a matter of law." *IKON*, 277 F.3d at 666 (emphasis added) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment further requires the non-moving party to "go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

**III**. **TILA Claim**

Plaintiffs' original theory of the case, as articulated in their complaint, was that TILA was violated when, among other things, they were not furnished with a notice of their right to rescind and were not informed of certain other material terms and conditions in connection with the sale-leaseback operation. *See, e.g.*, *Sherzer v. Homestar Mortg. Servs.*, 707 F.3d 255, 255–56 (3d Cir. 2013) (discussing briefly that statutory framework of TILA). Significantly, the original complaint did not target Dy in particular, but rather alleged that "the [d]efendants" were at

fault—a group that, at the time of filing, included a bank and a mortgage company, entities traditionally associated with credit transactions. Although continuing to allege that Dy engaged in a "blatant violation[]" of TILA, plaintiffs have struggled to articulate his *specific* culpability under the statute. For example, they point to Dy's post-hoc, allegedly inaccurate representations to banks regarding additional financing Dy acquired using plaintiffs' residence as collateral, but plaintiffs do not connect the relevance of these statements to their TILA allegations. [*See* D.E. 108.]

Both the rescission and civil penalty provisions of TILA lay out the obligations of a "creditor." *See, e.g.*, 15 U.S.C. §§ 1635(a), 1640(a) (2006); *In re Armstrong*, 288 B.R. 404, 412 (Bankr. E.D. Pa. 2003).[4] As put forth in 15 U.S.C. § 1602(f) (2006), the relevant definition of "creditor" refers:

> only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. . . . Any person who originates 2 or more mortgages referred to in [15 U.S.C. § 1602(aa) (2006)] in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this title.

Although they are not all in accord, courts generally view the final sentence ("Any person . . .") as a modification of the first, defining as "regularly extending credit" those entities who originate the kinds of mortgages discussed in subsection (aa). *See, e.g.*, *Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 272–73 (4th Cir. 2008); *see also id.* at 273 n.3 (collecting cases). "'Whether one is a TILA creditor is a bifurcated question, requiring a person both to be a 'creditor' in general, by extending credit in a certain minimum number of transactions, and to be the 'creditor' in the

[4] TILA was amended in 2008, 2009, and 2010. The Court will use the version in effect at the time of Dy's alleged violation.

specific transaction in dispute.'" *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 411 (3d Cir. 2000) (quoting James Lockhart, Annotation, *Who is "Creditor" within Meaning of § 103(f) of Truth in Lending Act*, 157 A.L.R. Fed. 419, 443 (1999)).

Dy asserts, and plaintiffs do not dispute, that this particular transaction was the first and only time he engaged in such an arrangement. (*See, e.g.*, Dy Cert. ¶ 3 [D.E. 96-1].). So the unmodified first sentence of the statute—requiring the "regular" extension of consumer credit—does not to apply to him.[5] Hence, Dy can be a TILA creditor only if he meets the regularity exception by having originated at least one subsection (aa) mortgage through a mortgage broker.

A subsection (aa) mortgage is defined alternately as follows:

> (aa) (1) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if--
> (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or
> (B) the total points and fees payable by the consumer at or before closing will exceed the greater of--
> (i) 8 percent of the total loan amount; or
> (ii) $ 400.

15 U.S.C. § 1602(aa) (2006). Although demonstrating that the mortgage meets one of the (aa) definitions may not be required at the pleading stage, *see Carmen v. Metrocities Mortg. Corp.*, No. 08-2729, 2009 U.S. Dist. LEXIS 42245, at *15 (D.N.J. May 18, 2009) (Kugler, J.), it is a necessary element for assessing liability from that point onward.

Having drilled down this far, the Court is satisfied that no material dispute can exist on this record about whether the statutory prerequisites are satisfied. As the Court found in its order

[5] "Regulation Z" further expands upon the definition of "regularly" in cases that do not involve high-interest mortgages. *See Cetto*, 518 F.3d at 272–73 (citing 12 C.F.R. § 226.2(a)(17)(i)); *see also Pollice*, 225 F.3d at 411 & n.37.

identifying the issues for trial, plaintiffs attempted to assert various statutory bases for Dy's liability, but failed because the theory advanced for each statute was unsupported by evidence. Although the Court preserved the TILA claim then, it did so on the basis that evidence would determine whether the transaction between the parties qualified as an "equitable mortgage." Even if that happened, if Dy is not a TILA creditor the claim cannot go forward against him, and the Court is satisfied that there is simply no record support for such an assignment of status. *See S.H. v. Lower Merion Sch. Dist.*, No. 12-3264, ___ F.3d ___, 2013 U.S. App. LEXIS 18458, at *19 (3d Cir. Sept. 5, 2013) (citation omitted).

At the heart of the deficiency is a lack of any concrete documentary evidence about the terms of the arrangement between Dy and plaintiffs. Put baldly, Pamela Peters has not even established with any clarity how much Dy "loaned" her and her husband. For example, Dy testified at deposition that he did not have an agreement with plaintiffs to buy the property for a specific amount. (Dy Dep. 38:8–11 [D.E. 108-3].). Plaintiffs claim that defendant Roland David (not defendant Dy) later offered to sell them back the home for $279,000 (*see, e.g.*, Compl. ¶ 31; FPTO 5), but this allegation is hearsay (*see* Fed. R. Civ. P. 56(c)(2), (4)) and the entire relationship between Dy and Roland David is otherwise shrouded in mystery. And with regard to subsection (aa)(1)(B) (the "total points and fees" analysis), assuming that the "loan" would be the amount Dy spent to pay off plaintiffs' mortgage to Greenpoint—$220,824.46 [D.E. 38-1]—the materials presently in the record do not show a points-and-fees expenditure in excess of 8% of that amount, or $17,665. Any effort to create such a carve-out would be pure speculation.

Where not only the existence of a loan, but how much the loan was for, remains unsupported by record evidence, the theory that TILA liability can be attributed to an individual who concededly does not "regularly" extend consumer credit must fail. No reasonable juror

could find that the elements of a TILA claim are supported. In short, plaintiffs have not adduced evidence to permit them to submit a TILA claim to the jury. Hence, the Court grants summary judgment in favor of Dy on count one of the complaint, because there is no genuine dispute over whether Dy is a statutorily defined "creditor," as he must be in order for liability to attach.

**IV. Remaining State-Law Claims**

For trial purposes, remaining are two of plaintiffs' New Jersey Consumer Fraud Act claims and Dy's counterclaims for negligent misrepresentation and fraud. [D.E. 169.] All are claims under New Jersey law.

Under 28 U.S.C. § 1367(c)(3), a court may decline to exercise supplemental jurisdiction over state-law claims if it has "dismissed all claims over which it has original jurisdiction."[6] The Third Circuit has recognized that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added) (citations omitted). Within this constricted rubric, the decision to dismiss or to retain jurisdiction represents an exercise of this Court's discretion. *See Bright v. Westmoreland Cnty.*, 443 F.3d 276, 286 (3d Cir. 2006). "[T]he district court must first identify the dismissal that triggers the exercise of discretion and then explain how declining jurisdiction serves the objectives of economy, convenience and fairness to the parties, and comity." *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003).

[6] Although the statutory language refers to "dismissal," its teachings apply with equal force in the context of claims resolved under summary judgment. *See, e.g.*, *Tate v. Dist. of Columbia*, 627 F.3d 904, 913 (D.C. Cir. 2010); *Bryant v. Adventist Health System/W.*, 289 F.3d 1162, 1169 (9th Cir. 2002) ("Because the district court did not err in granting summary judgment on the federal claims, it did not abuse its discretion in dismissing the state-law claims.").

As the docket reveals, the Court has spent considerable resources in fostering settlement, and, after the parties failed, in specifically defining what the issues are. The Court may have finally reached a coherent legal theory, but not one that supports a federal claim. As far as economy, convenience, and fairness to the parties are concerned, one side has already requested an adjournment, which was not objected to. There would be no geographical inconvenience. Straightened resources require that the Court look hard and fast at the economy factor when it considers bringing jurors to the federal courthouse to try a state law case. Fairness to the parties strongly suggests that when attorneys have been unable to meet the rigors of federal practice, the state courts[7] are the more hospitable forum for both sides, particularly when plaintiffs are presenting issues of New Jersey statutory construction—which satisfies the comity factor.

**V. <u>Conclusion</u>**

For the foregoing reasons, the Court grants summary judgment for defendant Dy on the TILA claim, and dismisses without prejudice the remainder of the pending claims pursuant to 28 U.S.C. § 1367(c). An appropriate order will be issued with this opinion.

September 16, 2013 /s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J

[7] Both sides' claims are still viable, as the statute of limitations has been tolled while this action was pending. *See Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting 28 U.S.C. § 1367(d)).